IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 13, 2001 Session

## CITY OF CHATTANOOGA  v.  KEVIN DAVIS

**Appeal by Permission from the Court of Appeals**
**Criminal Court for Hamilton County**
**No. 225103      Hon. Douglas A. Meyer, Judge**

**No. E2000-00664-SC-R11-CV - Filed September 4, 2001**

AND

## FRANK BARRETT  v.  METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 98C-1095      Hon. Walter C. Kurtz, Judge**

**No. M1999-01130-SC-R11-CV - Filed September 4, 2001**

The primary issue presented by these consolidated cases is whether Article VI, section 14 of the Tennessee Constitution, which prohibits the laying of fines in excess of fifty dollars unless assessed by a jury, applies to proceedings for the violation of a municipal ordinance. We hold that Article VI, section 14 does apply to such proceedings when either the intended purpose or the actual purpose or effect of the monetary assessment is to serve as a punitive measure. To the extent that O'Dell v. City of Knoxville, 54 Tenn. App. 59, 388 S.W.2d 150 (1964), would compel a contrary conclusion, it is expressly overruled.

We further hold that the assessment imposed by the Chattanooga City Court in City of Chattanooga v. Davis was punitive in its intended purpose and therefore subject to constitutional limitation. As for the assessments imposed in Barrett v. Metropolitan Government, we hold that the actual purpose

and effect of all these sanctions were to impose punishment for ordinance violations.  Therefore, the judgment of the Court of Appeals is affirmed as modified and explained below in Davis's case, and the judgment of the Court of Appeals is reversed in Barrett's case.  Because no court, other than one of general jurisdiction, has been granted the authority to empanel a jury to determine facts or to impose punishment, we reduce each of the unlawful fines imposed in these cases to fifty dollars, the maximum assessment allowed under such circumstances by Article VI, section 14.

With regard to the additional issues raised in City of Chattanooga v. Davis, we hold that Tennessee Code Annotated section 6-54-306 does not facially violate Article VI, section 14.  With regard to the allegations that Tennessee Code Annotated sections 6-54-306 and 55-10-307 violate the Class Legislation Clause of Article XI, section 8, we dismiss the challenge to section 6-54-306 as moot.  As to section 55-10-307, we hold that this statute does not violate Article XI, section 8 for the sole reasons that a distinction is made between municipalities and unincorporated areas of the state or that different punishments may be imposed by substantially similar or identical offenses.  Finally, we hold that Davis lacks legal standing to challenge the policies and practices of the City of Chattanooga that arguably infringe upon the District Attorney General's constitutional and statutory authority in Hamilton County.  The judgment of the Court of Appeals on these issues is affirmed as modified herein.

**Tenn. R. App. P. 11 Application for Permission to Appeal;
Judgment of the Court of Appeals Affirmed in Part, and Affirmed in Part as Modified
in City of Chattanooga v. Davis; Judgment of the Court of Appeals
Reversed in Barrett v. Metropolitan Government**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

Jerry H. Summers, Chattanooga, Tennessee, for the appellant, Kevin Davis.

Kenneth O. Fritz, Chattanooga, Tennessee, for the appellee, City of Chattanooga.

John E. Herbison, Nashville, Tennessee, for the appellant, Frank Barrett.

Karl F. Dean and John L. Kennedy, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Peter M. Coughlan, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

James W. Kirby, Nashville, Tennessee, for Amicus Curiae, Tennessee District Attorneys General Conference.

**OPINION**

The primary issue in these consolidated cases is whether a monetary assessment imposed for the violation of a municipal ordinance is subject to the provisions of Article VI, section 14 of the Tennessee Constitution. This section, also commonly known as the Fifty-Dollar Fines Clause, reads as follows:

> No fine shall be laid on any citizen of this State that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars.

The appellant in City of Chattanooga v. Davis also raises three additional issues: (1) whether Tennessee Code Annotated section 6-54-306 violates Article VI, section 14, either on its face or as applied to this case; (2) whether Tennessee Code Annotated sections 6-54-306 and 55-10-307 violate Article XI, section 8 of the Tennessee Constitution, either on their face or as applied to this case; and (3) whether the City of Chattanooga has used section 55-10-307 to infringe upon the District Attorney General's constitutional and statutory authority as set forth in Article VI, section 5 and Tennessee Code Annotated section 8-7-103. A brief review of the relevant facts of each of these cases will serve to place these issues in their proper context.

### *City of Chattanooga v. Davis*

On December 6, 1998, a Chattanooga City police officer cited the appellant, Kevin Davis, for reckless driving in violation of Chattanooga City Code section 24-13(a).[1] The appellant was ordered to appear before the Chattanooga City Court, and on January 12, 1999, he pleaded guilty and received a three-hundred dollar fine. The record contains no evidence that the court advised the appellant of any rights under Article VI, section 14 of the Tennessee Constitution or that he waived any such rights before entering his plea.

The appellant then filed a timely petition before the Hamilton County Criminal Court, requesting dismissal of the charges against him on three primary grounds: (1) that the three-hundred dollar penalty imposed by the City Court violated Article VI, section 14; (2) that Tennessee Code

---

[1] Chattanooga City Code section 24-13(a) reads as follows:

(a)    Any person who drives any vehicle in wilful or wanton disregard for the safety of persons or property is guilty of reckless driving.

Annotated section 6-54-306[2] and Chattanooga City Code section 1-8(a),[3] which both permit the City to impose "monetary penalties" in amounts up to five hundred dollars, violate Article VI, section 14; and (3) that section 6-54-306 violates the Equal Protection Clause of the Fourteenth Amendment and the Class Legislation Clause of Article XI, section 8 of the Tennessee Constitution.[4] After holding a hearing on these issues on June 21, the criminal court held that the city court's three-hundred dollar assessment violated Article VI, section 14 of the Tennessee Constitution, and it reduced the appellant's penalty to fifty dollars. The criminal court also upheld the constitutionality of Tennessee Code Annotated section 6-54-306 and Chattanooga City Code section 1-8(a).

On July 14, 1999, the criminal court issued an order enjoining the City from imposing monetary penalties in excess of fifty dollars.[5] When the City moved to dissolve or modify the injunction, the appellant asked the court to "clarify" its position concerning the constitutionality of Tennessee Code Annotated section 6-54-306.[6] The appellant also formally challenged the

---

[2] Tennessee Code Annotated section 6-54-306 provides that "[a]ll home rule municipalities are empowered to set maximum penalties of thirty (30) days imprisonment and/or monetary penalties and forfeitures up to five hundred dollars ($500), or both, to cover administrative expenses incident to correction of municipal violations."

[3] Chattanooga City Code section 1-8(a) reads as follows:
> Wherever in this Code or in any ordinance or rule or regulation promulgated by any officer of the city under authority vested in him by law or ordinance, any act is prohibited or is declared to be unlawful or a misdemeanor, or the doing of any act is required, or the failure to do any act is declared to be unlawful, the violation of any such provision of this Code or any such ordinance, rule or regulation shall be punished by a monetary penalty and forfeiture not exceeding five hundred dollars ($500.00).

[4] Article XI, section 8 is similar to the Equal Protection Clause of the Fourteenth Amendment, and it provides that
> [t]he Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

The appellant further argued that Tennessee Code Annotated section 6-54-308, which permits non-home-rule municipalities to establish monetary penalties not exceeding five hundred dollars, also violated Article XI, section 8. The constitutionality of section 6-54-308 has not been raised on this appeal, and it appears to have no direct application to the issues presented before this Court. Therefore, we do not refer to this provision in the procedural history of the case.

[5] While not strictly relevant for purposes of this appeal, the criminal court modified its order to permit the City to collect fines imposed before the injunction.

[6] Although the criminal court initially ruled that section 6-54-306 was constitutional, in another case following the June 21 hearing, the court found that this statute was unconstitutional. It was in light of this subsequent ruling that the appellant requested clarification of the "court's present position" on this issue.

-4-

constitutionality of Tennessee Code Annotated section 55-10-307,[7] which permits municipalities to adopt by reference certain state offenses as city ordinances, as violative of the Class Legislation Clause and of the District Attorney General's authority under Article VI, section 5.[8] The court postponed the hearing on the matters, and it permitted the Attorney General to defend the constitutionality of these statutes.

After holding hearings on August 13 and September 17, the criminal court issued an opinion in favor of the appellant, concluding as follows: (1) that the appellant did not execute a written waiver of his right to trial by jury, and therefore, the fine imposed could not exceed fifty dollars; (2) that as applied, Tennessee Code Annotated section 6-54-306 violates the Fourteenth Amendment and Article XI, section 8, because "[t]here is no reasonable basis or criteria by which [home rule municipalities] can be considered as a class different from other municipalities or unincorporated areas of the State"; (3) that as applied, Tennessee Code Annotated section 55-10-307 denies citizens the equal protection of the law and infringes upon the constitutional and statutory authority of the District Attorney General to prosecute violations of state law; and (4) that as enacted, City Code section 1-8(a) violates Tennessee Code Annotated section 6-54-306 because it fails to set maximum penalties of thirty days imprisonment, because it states that violations of municipal ordinances "shall be punished by a monetary penalty," (emphasis in original), and because it does not limit any penalties to those necessary to recover administrative expenses.

The City of Chattanooga appealed these findings to the Court of Appeals, which reversed the criminal court and dissolved the injunction. As to the proper amount of the fine, a majority of the intermediate court found that the city court did not violate Article VI, section 14 by imposing a three-hundred dollar fine. In a thorough examination of the nature of municipal court proceedings,

---

[7] Tennessee Code Annotated section 55-10-307(a) provides that

[a]ny incorporated municipality may by ordinance adopt, by reference, any of the appropriate provisions of §§ 55-8-101--55-8-180, 55-10-101--55-10-310, 55-50-301, 55-50-302, 55-50-304, 55-50-305, 55-50-311, and 55-50-312, and may by ordinance provide additional regulations for the operation of vehicles within the municipality, which shall not be in conflict with the provisions of such sections. All fines, penalties, and forfeitures of bonds imposed or collected under the terms of §§ 55-50-311 and 55-50-312, shall be paid over to the appropriate state agency as provided in § 55-50-604.

Pursuant to this statute, the Chattanooga City Council adopted Tennessee Code Annotated section 55-10-205 as Chattanooga City Code section 24-13.

[8] Article VI, section 5 provides for the constitutional offices of the State Attorney General and local District Attorneys General:

An Attorney General and Reporter for the State, shall be appointed by the Judges of the Supreme Court and shall hold his office for a term of eight years. An Attorney for the State for any circuit or district, for which a Judge having criminal jurisdiction shall be provided by law, shall be elected by the qualified voters of such circuit or district, and shall hold his office for a term of eight years, and shall have been a resident of the State five years, and of the circuit or district one year. In all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, the Court shall have power to appoint an Attorney pro tempore.

the court concluded that assessments imposed for a municipal ordinance violation are not "fines" within the meaning of Article VI, section 14. Interestingly, however, while the majority held that the three-hundred dollar sanction imposed by the city court was not in violation of Article VI, section 14, it nevertheless affirmed the criminal court's reduction of the fine as being within the penalty range of City Code section 1-8(a). Although the majority had misgivings about its holding on this issue, it believed that City of Chattanooga v. Myers, 787 S.W.2d 921 (Tenn. 1990), and O'Dell v. City of Knoxville, 388 S.W.2d 150 (Tenn. Ct. App. 1964), compelled its result.

Writing in dissent, Judge Franks stated that the three-hundred dollar assessment was clearly a "fine" within the meaning of Article VI, section 14, as it carried with it many attributes of punishment. Judge Franks also disagreed with the majority's application of Myers and O'Dell, finding that these cases were contradicted by Metropolitan Government v. Miles, 524 S.W.2d 656 (Tenn. 1975), and O'Haver v. Montgomery, 120 Tenn. 448, 111 S.W. 449 (1908). All three judges agreed, however, that the law in this area needed to be clarified.

With respect to the other issues raised by the City, the majority of the Court of Appeals found that Tennessee Code Annotated sections 6-54-306 and 55-10-307 were constitutional on their face and as applied. With respect to 6-54-306, the court held that a reasonable basis exists for distinguishing between municipalities and unincorporated areas, because municipalities have "a unique interest in addressing prohibited conduct that occurs within [their] geographic borders." Addressing section 55-10-307, the majority held that cities may impose penalties different from those imposed by state law—even when the elements of the ordinance are substantially similar to those found in a state offense—to further their own interest in regulating the use of their streets. The majority also held that this statute did not infringe upon the District Attorney's constitutional or statutory authority to prosecute state crimes because the record contained no evidence of a "policy and practice" by the City to cite "*all* those who violate state traffic laws within the City's borders to the city court to be tried for violating a city ordinance . . . ." (emphasis in original).

We then granted Davis's application for permission to appeal.

### *Barrett v. Metropolitan Government*

Over the course of eleven months from April 1995 to March 1996, the Metropolitan Government of Nashville and Davidson County ("Metropolitan Government") served five civil warrants on the appellant, Frank Barrett, alleging various violations of Title 16 of the Metropolitan Code of Laws. More specifically, three of these warrants charged that the appellant, who is the sole owner of a business that installs prepared roof coverings, failed to obtain necessary building permits before replacing several roofs. One other warrant alleged that he improperly installed roof underlayment, and the final warrant alleged that he failed to comply with a stop-work order.[9]

---

[9] This final warrant actually contained two separate charges: failure to secure a building permit and failure to abide by a stop-work order. Despite the two different charges, the general sessions court imposed a single five-

(continued...)

A single hearing on each of these five warrants was held before the General Sessions Court for Davidson County on February 20, 1998. At this hearing, the Metropolitan Government sought the maximum assessment of five hundred dollars for each violation, as is permitted by current Code of Laws section 16.04.172(A). After hearing testimony and arguments of counsel, the general sessions court found "by clear and convincing evidence that the defendant [was] guilty of the charges as set out," and it imposed a fine of five hundred dollars, plus court costs, for the violation of each warrant. Prior to this hearing, the appellant unsuccessfully demanded a jury trial, and he specifically declined to waive any rights under Article VI, section 14 of the Tennessee Constitution.

Thereafter, the appellant sought and obtained a writ of certiorari from the Davidson County Circuit Court to review whether the general sessions court had exceeded its jurisdiction by imposing fines in excess of fifty dollars. The Circuit Court found that the general sessions court had in fact exceeded its jurisdiction, and it based this finding in large part on the particular terminology used by the Code of Laws to label the penalties imposed for violations:

> The Court finds that it must place some validity in the Council's choice of words. The very foundation or the basics of statutory construction mandate that a court must pay attention to the plain meaning of what a legislative body says. . . . The Court recognizes that there is a distinction between the use of the word, penalty, in the law, and the use of the word, fine.
> The Metropolitan Council, the legislative body here in the Metropolitan Government, for whatever reason, chose to use the word, fine. The Court thinks that they are bound by that choice.

The Metropolitan Government appealed this finding to the Court of Appeals. The intermediate court reversed the circuit court, concluding that the label attached to the assessment was immaterial to whether an assessment was within the scope of Article VI, section 14. Instead, the court held that because proceedings to recover fines for the violation of a municipal ordinance have largely been considered to be in the nature of a civil debt, no assessment arising out of these proceedings could be subject to limitation by the Fifty-Dollar Fines Clause. The court was also of the opinion that Barrett could have avoided this issue had he appealed the judgment of the general sessions court—instead of proceeding by writ of certiorari—for trial *de novo* before a jury.

We then granted Barrett's application for permission to appeal on the sole issue of whether the assessments by the Davidson County General Sessions Court were "fines" within the meaning of Article VI, section 14. This case was consolidated for argument with City of Chattanooga v. Davis, in which we also granted permission to appeal on the remaining issues addressed by the Court

---

[9] (...continued)
hundred dollar fine without distinguishing between the two violations. Because three other warrants also address failures to secure a building permit, for ease of analysis in this opinion, we treat this final warrant as addressing only the stop-work order violation.

of Appeals.[10]  For the reasons given herein, we hold that proceedings involving the violation of a municipal ordinance may be subject to the limitations of Article VI, section 14 when either the intended purpose or the actual purpose or effect of the monetary assessment is to serve as a punitive measure.  With respect to Davis's case, we further hold that the three-hundred dollar assessment was intended to serve as a punitive sanction and that his fine must be reduced to fifty dollars.  With regard to Barrett's case, we hold that the actual purpose and effect of these sanctions were to punish the violations of the Code of Laws and that these five fines must also be reduced to fifty dollars each. Therefore, the judgment of the Court of Appeals is affirmed as modified in Davis's case, and the judgment of the Court of Appeals is reversed in Barrett's case.  With respect to the remaining issues in Davis's case, we find that none warrants judicial relief, and we affirm the judgment of the Court of Appeals, as modified herein.

## I.  APPLICATION OF ARTICLE VI, SECTION 14 TO PROCEEDINGS FOR THE VIOLATION OF A MUNICIPAL ORDINANCE

The common issue presented by both Davis and Barrett is whether a monetary assessment imposed for the violation of a municipal ordinance is subject to the provisions of Article VI, section 14 of the Tennessee Constitution.  Although we have had several previous opportunities to examine the Fifty-Dollar Fines Clause in its various aspects, we have yet to analyze its effect within the specific context of a proceeding for a municipal ordinance violation.  Therefore, because this is an issue of first impression for this Court, it is perhaps helpful to first examine the historical background of this important constitutional provision.

### A.  HISTORICAL BACKGROUND OF ARTICLE VI, SECTION 14

Article VI, section 14 is unique in the whole of American constitutional law, and no other provision like it may be found either in the Federal Constitution or in any other modern state constitution.  Although this provision dates to our first Constitution signed in Knoxville in February 1796, we know little else about its origin.  Similar clauses did not appear in any colonial charter, in

---

[10] Oral argument was heard in these cases on June 13, 2001, in Nashville.  Although Chief Justice Anderson was unavoidably absent from argument, the parties were informed in open court of his participation in the discussion and decision of these cases pursuant to Rule 1(a)(ii) of the Internal Operating Procedures of the Tennessee Supreme Court:

Absent exceptional circumstances, all members of this Court shall participate in the hearing and determination of all cases unless disqualified for conflicts.  However, a hearing shall proceed as scheduled notwithstanding the unavoidable absence of one or more justices.  Any justice who is unavoidably absent from the hearing may participate in the determination of the case either by teleconferencing, videoconferencing, or by reviewing the tape of oral argument, subject to the determination of the Chief Justice.  Counsel shall be advised in open court that the absent justice will fully participate in the discussion and decision of the case.

any early state constitution, including the 1776 North Carolina Constitution, or in the Constitution of the State of Franklin.[11]

Instead, as the Journal of the 1796 Constitutional Convention reveals, the Fifty-Dollar Fines Clause made its first appearance in the jurisprudence of this state on Saturday, January 30, 1796, when it was appended to a proposed draft constitution as section 9 of the article governing the judiciary. As originally proposed, this provision read: "No fine shall be laid on any citizen of this state, that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact." Tenn. Const. art. V, § 9 (1796 draft). Though the Journal of the 1796 Convention was not kept as a verbatim record of the proceedings, no discussion or debate concerning the draft of this clause is evident. Indeed, the final provision issuing from the Convention was precisely the same as that initially proposed, except that it was amended at some point to add a final clause, "if they [the jury] think the fine ought to be more than fifty dollars." Tenn. Const. art. V, § 11 (1796).[12]

During the summer of 1834, sixty delegates met in Nashville "for the purpose of revising and amending the Constitution," which had remained unaltered for nearly four decades. A provision identical to Article V, section 11 of the 1796 Constitution was reported to the Committee of the Whole on July 25 for consideration, and this provision was considered by the Convention on August 6. In stark contrast to virtually every other provision governing the judiciary, the Fifty-Dollar Fines Clause received scant attention. Although one amendment was proposed by William Ledbetter of Rutherford County—the addition of a final sentence, "[a]nd if the defendant shall submit, it shall not prevent the court from empaneling a jury instanter to assess the fine if it should seem proper to said court"—it was defeated, and the Convention adopted the provision as originally proposed. In its final form, the Fifty-Dollar Fines Clause appeared in Article VI, section 14 of the new Constitution, with only two non-substantive changes to its former text: (1) the capitalization of "State" in the first clause of the provision, and (2) the syntactical amendment of the final clause to read, "if they think the fine *should be over* fifty dollars." (emphasis added).

---

[11] Indeed, none of the documents contains any provision that withholds from judges the power to impose certain types of punishments. Interestingly, however, the notion of withholding certain punishments from judges is not unique in Tennessee history, and one such provision appeared in this state as early as 1780 in the Cumberland Compact. This Compact, which established a court of twelve judges clothed with civil and criminal jurisdiction, expressly withheld from judges the power to impose punishments affecting "life or member." Instead, the Compact placed this power of punishment within the sole discretion of a jury. See Cumberland Compact of Government (May 1, 1780), *reprinted in* John Trotwood Moore, *Tennessee, The Volunteer State* 111 (1923).

[12] Despite the apparent lack of contention surrounding the Fifty-Dollar Fines Clause in the 1796 Convention, the clause sparked some controversy in the House of Representatives during the debates over Tennessee's admission to the Federal Union. In particular, Representative William L. Smith, a Federalist from South Carolina, claimed that this clause specifically, along with a few others, "seemed to clash with some of the stipulations in the [1787 Northwest] ordinance and with the Constitutional rights of Congress." See *Antebellum Tennessee: A Documentary History* 87 (Eric R. Lacy, ed. 1980). Representative Smith did not elaborate further as to precisely which Northwest Ordinance provisions or "rights of Congress" Article V, section 11 found itself in conflict.

Following the War Between the States, Tennessee entered its present constitutional period following another major convention held in Nashville during the winter of 1870. Given its unobtrusive history, it is perhaps not surprising that Article VI, section 14 was readopted without any recorded debate or proposed amendment. Although the Standing Committee on the Judiciary proposed many revisions to Article VI in its report to the Convention, the 1870 Journal records that neither the majority nor the minority reports from that committee advised changing any part of section 14. When the Convention considered this provision on February 4, the Journal merely reports, again in stark contrast to the other provisions of Article VI, that "Section 14 was adopted as recommended by the [Judiciary] Committee." Consequently, the Fifty-Dollar Fines Clause emerged from the 1870 Convention in a form identical to that ratified earlier in March 1835, save only minor changes in its punctuation, and it has remained unchanged to this day.

Interestingly, prior to the current constitutional period beginning in 1870, no case construed or discussed the substantive import of the Fifty-Dollar Fines Clause. In 1873, this Court first noted that Article VI, section 14 is "manifestly an amplification of the provisions contained in [section] 16, [article] 1, against the imposition of excessive fines." France v. State, 65 Tenn. (6 Baxt.) 478, 485 (1873); see also State v. Bryant, 805 S.W.2d 762, 767 (Tenn. 1991). Since then, this Court has further recognized that the intent behind limiting the ability to lay fines "was to prevent judges from imposing unreasonable fines, and to prevent confiscation of the citizen's substance under the guise of a statute applied by a judicial tribunal." Upchurch v. State, 153 Tenn. 198, 205, 281 S.W. 462, 464 (1926); see also State v. Martin, 940 S.W.2d 567, 570 (Tenn. 1997). Indeed, as this Court observed in Poindexter v. State, 137 Tenn. 386, 393, 193 S.W. 126, 128 (1917), "[w]ere it not for section 14 of article 6 of the Constitution, an impecunious defendant upon whom a large fine had been imposed might be imprisoned for years at the will of the judge alone who tried him."

Nevertheless, as this Court has acknowledged for nearly a century, the restriction on imposing "fines" contained in Article VI, section 14 does not prevent a court from imposing any monetary assessment in excess of fifty dollars. At the time that the 1796 Constitution was drafted and ratified, the term "fine" was understood to mean "a payment to a sovereign as punishment for some offense," see Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, 492 U.S. 257, 265 (1989),[13] and as we held long ago in Poindexter, Article VI, section 14 does not apply to assessments greater than fifty dollars when the assessment is not punitive in nature. To that end, Article VI, section 14 has not stood as a bar to the imposition of non-punitive measures, such as requiring a defendant to execute a $240 bond to secure child support payments, see Poindexter, 137 Tenn. at

_____

[13] In footnote 6 of its opinion, the Ferris-Browning Court traced the meaning of the term "fine" at the time of the adoption and ratification of the Eighth Amendment:

> A "fine signifieth a percuniarie punishment for an offence, or a contempt committed against the king." 1 E. Coke, Institutes *126b. The second edition of Cunningham's Law-Dictionary, published in 1771, defined "fines for offences" as "amends, pecuniary punishment, or recompence for an offence committed against the King and his laws, or against the Lord of a manor." 2 T. Cunningham, A New and Complete Law-Dictionary (unpaginated). See also 1 T. Tomlins, Law-Dictionary 796-799 (1836) (same); 1 J. Bouvier, Law Dictionary 525 (4th ed. 1852) (same).

Ferris-Browning Indus. of Vt., Inc., 492 U.S. at 265 n.6.

396-97, 193 S.W. at 128, or requiring that a defendant make monthly support payments of sixty dollars, see Abbott v. State, 190 Tenn. 702, 704, 231 S.W.2d 355, 356 (1950).

## B.  ARTICLE VI, SECTION 14 AND PROCEEDINGS INVOLVING THE VIOLATION OF A MUNICIPAL ORDINANCE

Given that Article VI, section 14 has been held to make a substantive distinction between punitive and non-punitive assessments, a significant question has been presented as to whether the Fifty-Dollar Fines Clause applies to sanctions imposed for the violation of a municipal ordinance. Both panels of the Court of Appeals in these two cases believed that Article VI, section 14 does not apply to proceedings for municipal ordinance violations because these proceedings are usually considered to be civil in nature. This view is not without some support, and as even a brief review of the case law reveals, much ink has been spilled, in literally scores of cases, to delineate the precise nature and object of municipal court proceedings.

Since our decision in City of Chattanooga v. Myers, 787 S.W.2d 921 (Tenn. 1990), the law now appears settled that proceedings for a municipal ordinance violation are civil in nature, at least in terms of technical application of procedure and for pursuing avenues of appeal. Outside technical procedure and appeal, however, substantial conflict may still be found as to the characterization of the substantive nature of the proceeding. Indeed, depending upon the precise issue before the particular court, proceedings for a municipal ordinance violation have been described as "civil in character," City of Memphis v. Smythe, 104 Tenn. 702, 703, 58 S.W. 215, 215 (1900); as "partak[ing] more or less of a civil wrong," Hill v. State ex rel. Phillips, 216 Tenn. 503, 507, 392 S.W.2d 950, 952 (1965); as "partly criminal," O'Haver v. Montgomery, 120 Tenn. 448, 460, 111 S.W. 449, 452 (1908); and as "criminal rather than civil in substance," Metropolitan Gov't v. Miles, 524 S.W.2d 656, 660 (Tenn. 1975).

Despite these numerous and varying characterizations, however, the opinions of both panels below relied heavily upon O'Dell v. City of Knoxville, 54 Tenn. App. 59, 388 S.W.2d 150 (1964), which represents the only reported case that has directly addressed the effect of Article VI, section 14 upon proceedings involving a municipal ordinance violation. In O'Dell, the defendant was convicted of driving while under the influence of an intoxicant and was fined one hundred dollars by the Knoxville municipal court. Following an unsuccessful challenge to the fine in the Knox County Circuit Court as violative of Article VI, section 14, the defendant filed a direct appeal to this Court. We held that because civil practice governs proceedings for a municipal ordinance violation in terms of procedure and appeal, jurisdiction for the direct appeal was more properly with the Court of Appeals. See O'Dell v. City of Knoxville, 214 Tenn. 237, 240, 379 S.W.2d 756, 758 (1964). We then transferred the case by order to the intermediate court.

Before the Court of Appeals, the defendant again challenged the one-hundred dollar fine as violative of Article VI, section 14, but the intermediate court disagreed for two reasons. First, the court believed that because the Knoxville city ordinance itself characterized its sanction for driving-under-the-influence as a "penalty," and not as a "fine," the limitations of Article VI, section 14

-11-

simply did not apply.  See O'Dell, 54 Tenn. App. at 63, 388 S.W.2d at 152.  Second, it reasoned that because a proceeding for the violation of a municipal ordinance has long been held to be a civil action, no criminal sanction could have been imposed, and hence, the constitutional limitation on "fines" was inapplicable.  See id. at 64, 388 S.W.2d at 152.  Consequently, the O'Dell court upheld the one-hundred dollar fine as imposed.

Although both panels of the Court of Appeals in the cases now before us believed that O'Dell was unwavering in its conclusion that Article VI, section 14 could not apply to proceedings involving a municipal ordinance violation, a closer examination of the rationales employed by the O'Dell Court reveals that its analysis of this issue is severely flawed.  First, and without question, the precise name given to the sanction is hardly determinative of its substantive purpose or effect, and this method of constitutional interpretation is simply inadequate to properly resolve the question before us today.  As the Bard of 'Avon classically and eloquently expressed the sentiment, "What's in a name?  that which we call a rose, By any other name would smell as sweet." *Romeo and Juliet*, act II, scene ii.  Indeed, if one needed only to change the appellation of a constitutional protection in order to avoid its use as a shield against the power of the State, one could scarcely imagine that any safeguard of liberty would be worth its recitation in a written constitution.

Second, the O'Dell court exalted technical form over constitutional substance in a manner rarely seen elsewhere.  By holding that punitive sanctions, such as fines, can never be imposed in a "civil action," the O'Dell Court essentially accorded definitive constitutional significance to the title given a legal proceeding when conducting analysis under Article VI, section 14.  Since O'Dell, courts throughout the land have routinely condemned this method of constitutional analysis, and we expressly rejected it in Metropolitan Government v. Miles, 524 S.W.2d 656 (Tenn. 1975), when we stated that "[p]recious constitutional rights cannot be diminished or whittled away by the device of changing names of tribunals or modifying the nomenclature of legal proceedings.  The test must be the nature and the essence of the proceeding rather than its title."  Id. at 659 (citation and internal quotation marks omitted).[14]

Although the intended character of the proceeding may be relevant to the nature of a sanction imposed in that proceeding, the O'Dell Court was plainly misguided to the extent that it believed a court could not impose a punitive sanction in a "civil action."  As the United States Supreme Court has acknowledged, "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.  It is commonly understood that civil proceedings

_____

[14] As evidenced by the two opinions below in Davis, there has been some confusion as to the import of Miles in the wake of our decision in Metropolitan Government v. Allen, 529 S.W.2d 699 (Tenn. 1975).  In Allen, we again held that "[a]n appeal for the violation of a municipal ordinance is a civil action, triable [d]e novo in the circuit court in precisely the same manner and under the same procedural rules as those governing tort actions instituted in the General Sessions Courts, to include the right to a jury trial."  529 S.W.2d at 707.  Although we noted that Miles was "overbroad" in its statements that State v. Jackson, 503 S.W.2d 185 (Tenn. 1973), impliedly overruled O'Dell, we did not express any further dissatisfaction with Miles, which continues to represent an accurate statement of the law.  In any event, though Jackson did not impliedly overrule O'Dell, it must be conceded that Miles itself represents a definitive repudiation of the O'Dell rationale with regard to punitive sanctions in municipal proceedings.

may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties." Austin v. United States, 509 U.S. 602, 610 (1993) (citations and quotations omitted). Moreover, O'Dell's rationale has been substantially, if not entirely, abrogated by our recognition that civil proceedings may impose sanctions that are "so punitive in form and effect" as to trigger constitutional protections. See Stuart v. State Dept. of Safety, 963 S.W.2d 28, 33 (Tenn. 1998). Indeed, in the specific context of a "civil" proceeding for a municipal ordinance violation, this Court has held that the imposition of a pecuniary sanction triggers the protections of the double jeopardy clause to prevent a second "punishment" in the state courts for the same offense. See Miles, 524 S.W.2d at 660 ("We hold that the imposition of a *fine* is punishment." (emphasis in original)).

When examined in this light, it is clear that O'Dell does not represent an accurate statement of the law regarding application of the Fifty-Dollar Fines Clause. Therefore, to the extent that O'Dell compels the conclusion that proceedings involving municipal ordinance violations are outside the scope of Article VI, section 14, it is expressly overruled. Because Article VI, section 14 is concerned with the punitive purpose or effect of the sanctions imposed, the proper inquiry must be whether, despite the primary character of the proceeding, the purpose or effect of the monetary assessment is to further the goals of punishment. Accordingly, when analyzing issues touching upon the protections of Article VI, section 14, we will favor the substance of the sanction over its form, and we will not permit the language used to describe the particular sanction to govern the constitutional analysis. See State v. Martin, 940 S.W.2d 567, 570 (Tenn. 1997). We also recognize that a "fine" within the meaning of Article VI, section 14 may be imposed in a proceeding that has been traditionally considered to be civil in nature, and although the nature of the proceeding in which the assessment is imposed may be relevant to some aspects of the inquiry, it cannot simply be the sole or determinative factor.

## C. PROPER TEST TO DETERMINE WHETHER ARTICLE VI, SECTION 14 APPLIES TO A MONETARY ASSESSMENT

Because Article VI, section 14 applies to proceedings involving the violation of a municipal ordinance when the monetary sanction serves punitive goals, we must provide guidance as to how to properly determine the character of the assessment itself. From the outset, we acknowledge that only the rare case will admit of simple resolution, and these two cases in particular illustrate well the candid observation proffered by one scholar that "[a] criminal fine and a civil fine do not, by the very act of their imposition, distinguish themselves."[15] Indeed, although distinguishing between punitive and non-punitive measures may have been a comparatively simple task in 1796, it has since become an increasingly complex undertaking. As the rise of the modern administrative state has obscured

---

[15] See Carol S. Steiker, Punishment and Procedure: Punishment Theory and the Criminal-Civil Procedural Divide, 85 Geo. L.J. 775, 796 (1997). A similar observation was made by the United States Supreme Court in Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 778 (1994), when it stated that "[c]riminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals and deter certain behavior."

the line separating criminal and civil sanctions, many sanctions have become admittedly difficult to characterize as being in one class or the other. For example, many "civil" sanctions today seem designed, at least in part, to further some goals of punishment, and strict-liability criminal offenses aimed at protecting the public welfare are often cloaked with trappings that are traditionally associated with civil law. Nevertheless, despite the rigor and asperity of the task involved, Article VI, section 14 still commands that such a distinction be made.

*Excessive-fines Analysis*

In order to determine the proper character of any monetary assessment, both Davis and Barrett have urged this Court to adopt an analysis similar to that used to determine whether a "fine" is excessive under Article I, section 16 of the Tennessee Constitution and the Eighth Amendment. According to excessive-fines analysis under the state and federal constitutions, an otherwise civil sanction can become a "fine" subject to constitutional limitation when the sanction "is, at least in part, a punitive measure." Stuart, 963 S.W.2d at 34; see also United States v. Bajakajian, 524 U.S. 321, 329 n.4 (1998) (noting that Eighth Amendment analysis begins with a finding that the contested sanction, though also serving some remedial purpose, is "punitive in part"). As the United States Supreme Court has acknowledged, a sanction is "punitive in part" under this analysis when it serves either retributive or deterrent purposes. See Austin, 509 U.S. at 610.

It is true that Article VI, section 14 has been characterized as an extension of the Excessive Fines Clause of Article I, section 16, see, e.g., Bryant, 805 S.W.2d at 767, and to this extent, the position taken by Davis and Barrett seems initially appealing. Upon closer examination, though, we cannot agree that this analysis provides the appropriate framework for applying the Fifty-Dollar Fines Clause. As can be seen by our decision in Stuart, excessive-fines analysis can be applied even to those sanctions that primarily serve remedial purposes. See 963 S.W.2d at 34 (analyzing civil forfeitures). However, excessive-fines analysis does not automatically condemn all remedial measures merely for being punitive in part, because it further examines whether the sanction is proportional to the gravity of the defendant's conduct and culpability. Id. at 35; see also Bajakajian, 524 U.S. at 334.[16] By making this additional inquiry into the proportionality of the fine, analysis under the Excessive Fines Clauses makes appropriate allowance for those sanctions that primarily serve remedial purposes.

If only the first half of the excessive-fines analysis is adopted, as Davis and Barrett advocate, though, then no allowance can be made for those measures that are predominantly remedial in purpose. All monetary sanctions, even those principally designed to further remedial goals, share some traditional characteristics of punishment, such as ensuring deterrence against future wrongdoing. See Stuart, 963 S.W.2d at 34 (citing Hudson v. United States, 522 U.S. 93, 102 (1997)); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185 (2000).

---

[16] Of course, Stuart also requires examination of the relationship between the property and the offense, including whether use of the property was (a) important to the success of the crime, (b) deliberate and planned or merely incidental and fortuitous, and (c) extensive in terms of time and spatial use. 963 S.W.2d at 35.

-14-

As such, if an assessment is subject to constitutional limitation if it is only "punitive in part," then *all* monetary penalties, whether remedial or otherwise, would fall within the strictures of Article VI, section 14. However, because the Fifty-Dollar Fines Clause does not apply to those measures that serve primarily remedial goals, see Abbott, 190 Tenn. at 704, 231 S.W.2d at 356; Poindexter, 137 Tenn. at 396-97, 193 S.W. at 128, this method of analysis may be too broad in its application to provide much practical use. Therefore, because "care should be exercised not to convert [constitutional protections] into obstacles that prevent the enactment of honestly-motivated remedial legislation by subjecting laws to tests unsuited to the underlying purpose of these constitutional provisions," Doe v. Poritz, 662 A.2d 367, 388 (N.J. 1995), we decline to adopt the test as proposed by the appellants.

*Fines as Punishment Analysis*

Rather than adopt an approach that seems to apply when the sanction is only punitive in part, the better approach may be one that is more in line with the purposes of Article VI, section 14. As we stated earlier, the Fifty-Dollar Fines Clause restricts the ability of a judge to impose a particular form of punishment, see Martin, 940 S.W.2d at 570, and as such, the focus of any test should be upon whether the pecuniary sanction was imposed to serve primarily as a punitive measure. Therefore, other constitutional tests that examine whether a particular sanction is punitive in purpose should provide for more meaningful analysis.

This is not the first case in which we have determined whether a sanction is predominantly punitive or remedial in nature. In the context of double jeopardy analysis under Article I, section 10, we have adopted a test similar to that used in the federal courts to determine whether a second action is sufficiently punitive so as to constitute a second punishment for the same offense. See Stuart, 963 S.W.2d at 32. Under this analysis, a sanction is deemed to constitute punishment if (1) the legislative body intended that the sanction have a punitive purpose or effect; or (2) the "clearest proof" demonstrates that the sanction is "so punitive in fact that [it] cannot legitimately be viewed as civil in nature." Id. (citing United States v. Ursery, 518 U.S. 267, 288 (1996)). As one other court has phrased the essential characteristics of an identical inquiry,

> Thus, the determining factor of whether a sanction is criminal or civil is not necessarily the label given it by the legislature; rather a court confronted with a challenge to a nominally civil proceeding and sanction must examine whether the sanction is so punitive in effect that it can no longer be said to serve the remedial purposes of a civil sanction.

State v. Hurst, 688 N.E.2d 402, 404 (Ind. 1997) (citing, among others, Ursery, 518 U.S. at 288).

Upon careful consideration, we believe that the test adopted in Stuart provides a more appropriate framework in which to determine whether a monetary assessment is sufficiently punitive so as to fall within the restrictions of Article VI, section 14. This test focuses upon the intended and actual purpose or effect of the penalty itself, instead of upon the character of the proceeding in which

-15-

the penalty is imposed; it does not give determinative effect to the label attached to the sanction; and it sufficiently allows remedial sanctions to be given effect, even though such sanctions may also carry some traditionally punitive consequences such as deterrence. Accordingly, we hold that a monetary sanction imposed for a municipal ordinance violation falls within the scope of Article VI, section 14 when: (1) the legislative body creating the sanction primarily intended that the sanction punish the offender for the violation of an ordinance; or (2) despite evidence of remedial intent, the monetary sanction is shown by the "clearest proof" to be so punitive in its actual purpose or effect that it cannot legitimately be viewed as remedial in nature.

Having adopted the Stuart test to analyze issues arising under Article VI, section 14, the State urges this Court to also adopt the seven "guideposts" used by the United States Supreme Court in Hudson v. United States, 522 U.S. 93, 102 (1997), to determine whether a statutory scheme is punitive in its actual purpose or effect. These factors, which were originally articulated by the Supreme Court in Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963), and which have since been adopted by several other jurisdictions, include,

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

Hudson, 522 U.S. at 99-100 (citations omitted and alteration in original).

Several courts have found these factors to be of very little practical use, see, e.g., Poritz, 662 A.2d at 400-01; Opinion of the Justices, 668 N.E.2d 738, 750 (Mass. 1996), and we decline to adopt these factors for analysis under Article VI, section 14 largely because they do not adequately separate punitive penalties from those that are remedial in their actual purpose or effect. For example, although monetary penalties do not involve affirmative disabilities or restraints, this is not to say that the actual purpose of the penalty must therefore be remedial. Second, as evidenced by the Fifty-Dollar Fines Clause itself, monetary penalties have been traditionally regarded in this state as punishment in some instances, but not in others. As such, this second factor reveals little as to a penalty's actual purpose or effect within any given statutory scheme. Third, examination of scienter fails the object of the inquiry, because many strict liability criminal offenses are punished by fines. Likewise, asking whether the prohibited conduct is also a crime ignores the fact that a fine can still be remedial if it serves to correct or rectify a violation. Finally, asking whether the penalty serves the traditional goals of punishment is ineffective, because, as we have recognized, deterrence is present in *every* monetary penalty, irrespective of whether the penalty is actually remedial in its purpose or effect.

Consequently, rather than adopt these seven factors for analysis under the second prong of the Stuart test as the State urges, we conclude that the "clearest proof" of punitive purpose or effect is more properly established by considering whether the totality of the circumstances demonstrates that the statutory scheme truly envisions the pecuniary sanction as serving to remedy or to correct a violation. Examination of the role of the penalty within its particular statutory scheme is important, because, unlike analysis under the Excessive Fines Clause, see Browning-Ferris Indus. of Vt., Inc., 492 U.S. at 275, the focus of Article VI, section 14 is upon the punitive nature of the sanction, not upon the personal impact of the punishment to the defendant. Accordingly, in those cases in which a pecuniary sanction was originally intended to be remedial, courts should further examine the actual purpose or effect of the sanction within the context of its entire statutory scheme to determine whether the sanction truly functions as a remedial measure.

### D. APPLICATION TO CITY OF CHATTANOOGA v. DAVIS

Applying this framework of analysis to City of Chattanooga v. Davis, our first inquiry is to determine whether the intended purpose of the monetary sanction imposed for reckless driving is to punish violations of the law. Because "[t]he rules of statutory interpretation are [also] used when interpreting an ordinance," Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 802 (Tenn. 2000); see also Loggins v. Lightner, 897 S.W.2d 698, 702 (Tenn. Ct. App. 1994), we determine the intent and purpose of an ordinance primarily from the language used. We also endeavor to read an ordinance as a whole and "in conjunction with [its] surrounding parts." See State v. Turner, 913 S.W.2d 158, 160 (Tenn. 1995); see also 421 Corp. v. Metropolitan Gov't, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000) (stating rule in terms of interpreting a zoning ordinance).

Examining the relevant textual provisions of the Chattanooga City Code, little doubt can exist that the intended purpose of the penalty imposed on Davis for reckless driving was to punish for the violation of the ordinance. Chattanooga City Code section 24-13(b) sets forth the penalty for reckless driving:

> Every person convicted of reckless driving shall be punished upon the first conviction by a fine of not less than five dollars ($5.00), on a second conviction by a fine of not less than ten dollars ($10.00), on a third conviction by a fine of not less than twenty-five dollars ($25.00) and on all subsequent convictions by a fine of not less than fifty dollars ($50.00).

As the plain language of the ordinance shows, the intended purpose of the penalty is to punish the offender, and the language does not otherwise suggest any remedial purpose to be served by the fine. The ordinance further provides that the penalty is to be applied only after a "conviction" of the offense, further indicating that the sanction is intended to punish. Indeed, as this ordinance well illustrates, no more persuasive evidence of an intent to punish may be found except through express language to this effect.

This conclusion does not end our inquiry, however, because the Chattanooga City Court imposed the fine of three hundred dollars under section 1-8(a) of the City Code, instead of imposing a fine pursuant to section 24-13(b).[17] Chattanooga City Code section 1-8(a) provides that

> [w]herever in this Code or in any ordinance or rule or regulation promulgated by any officer of the city under authority vested in him by law or ordinance, any act is prohibited or is declared to be unlawful or a misdemeanor, or the doing of any act is required, or the failure to do any act is declared to be unlawful, the violation of any such provision of this Code or any such ordinance, rule or regulation shall be punished by a monetary penalty and forfeiture not exceeding five hundred dollars ($500.00).

Again, the intended purpose of this provision, plain on its face through the language used, is clearly to punish the offender for the violation of an ordinance. Although a "monetary penalty" can be imposed for remedial purposes in some circumstances, we find no such apparent purpose or intent present in this section. Rather, as applied to the offense of reckless driving in this case, the clearly intended purpose of the City Council in enacting the fine was to impose punishment.

In its analysis of Chattanooga City Code section 1-8(a), a majority of the judges on the panel below concluded that the City Council's choice of language in this section was insignificant. Citing Barrett v. Metropolitan Government, the intermediate court stated that the "[t]he fact that the City chose to use the language 'punished by a monetary penalty' does not alter the civil nature of the penalty imposed." We agree that the language of section 1-8(a) does not affect the character of the proceedings in which the fine is imposed. However, the character of the proceedings is largely irrelevant to the substantive analysis under Article VI, section 14, and because we hold today that the initial inquiry under the Fifty-Dollar Fines Clause is whether the legislative body intended the sanction to serve a punitive or a remedial purpose, express statements of that intent are especially relevant. Therefore, contrary to the conclusion reached by the Court of Appeals, the use of the term "punished" in section 1-8(a) is particularly relevant because it strongly indicates that the pecuniary sanction was intended by the City Council to constitute a punitive measure.

Considering both sections 24-13(b) and section 1-8(a), we conclude that the clear and predominant intention in imposing a fine for reckless driving is to punish the defendant for the

---

[17] Interestingly, Davis was not fined in accordance with the provisions of section 24-13(b), which, if followed, should have resulted in a five-dollar fine, given that he has no previous convictions for reckless driving. The record is unclear as to why the provisions of section 1-8(a) were held to govern over the more specific provisions of section 24-13(b), other than section 1-8(a) was apparently the last provision in time to be enacted. Nevertheless, Davis's only challenge in this Court is whether proceedings for the violation of a municipal ordinance are subject to the provisions of Article VI, section 14, and he has not challenged the trial court's reduction of the fine to fifty dollars as improper under the ordinance.

violation of that ordinance.[18]  Assuming presently that the General Assembly has granted the Chattanooga City Council authority to enact punitive sanctions in excess of fifty dollars,[19] we have been unable to locate any statute that confers upon the Chattanooga City Court the power or authority to empanel a jury for this purpose.  In fact, our research confirms that only courts of general jurisdiction have the power to empanel a jury to determine facts or to impose punishment.  Therefore, irrespective of any city ordinance to the contrary, the discretion of the Chattanooga City Court to impose punitive monetary sanctions is necessarily limited by Article VI, section 14 to fines not exceeding fifty dollars.  Accordingly, we affirm the reduction of the appellant's fine to that amount.  See Huffman v. State, 200 Tenn. 487, 501, 292 S.W.2d 738, 744 (1956) (stating that reduction of the fine on appeal is the proper remedy for a violation of Article VI, section 14), *overruled on other grounds*, State v. Irvin, 603 S.W.2d 121, 123 (Tenn. 1980); Christian v. State, 184 Tenn. 163, 165, 197 S.W.2d 797, 797-98 (1946) (stating that reduction is the proper remedy for a violation of Article VI, section 14, unless "it was impossible for a Court to impose even the minimum statutory fine without the intervention of a jury").[20]

The judgment of the Court of Appeals on this issue is affirmed as modified.[21]

---

[18]  In his dissenting opinion in the Court of Appeals, Judge Franks wrote that the graduated structure of the penalty, which provides for enhanced fines upon successive convictions, strongly indicates that the intent of this provision is to punish, rather than to serve any remedial purpose. We agree with this assessment, see, e.g., People v. Snook, 947 P.2d 808, 813 (Cal. 1997), and for this and other reasons, it appears that the sanction for reckless driving serves no remedial purpose at all.

However, because the punitive intent of this sanction is clear on the face of the various ordinances, it is unnecessary for us to further inquire as to whether the actual purpose or effect of the sanction is such that it cannot legitimately be viewed as remedial in nature. As such, we need not go as far as did the learned Judge below.

[19]  As we discuss below in section II.A., the claimed authority for the penalties in section 1-8(a) is Tennessee Code Annotated section 6-54-306. However, this statute plainly confers no such authority to enact punitive penalties in excess of fifty dollars, either with or without a jury. Instead, the penalties imposed under authority of section 6-54-306 are limited to the recovery of administrative expenses "incident to correction of municipal violations." Nevertheless, to illustrate the point and to leave no doubt as to our holding, we are assuming, for purposes of present analysis only, that the General Assembly has granted authority to the Chattanooga City Council to enact punitive penalties in excess of fifty dollars.

[20]  Huffman further held that when an appellate court vacates the verdict of the jury, but then affirms the defendant's conviction on a lesser-included offense, the court should remand the case for a jury to impose the fine if a fine is set forth as a means of punishment. See 200 Tenn. at 501, 292 S.W.2d at 744. Because such is not the case here, the appropriate remedy on appeal is reduction of the fine to fifty dollars.

[21]  As we stated earlier, the Court of Appeals held that the three-hundred dollar fine imposed by the city court was not subject to limitation by Article VI, section 14. However, the actual judgment of the intermediate court affirmed the fifty-dollar fine as reduced by the Hamilton County Criminal Court. Therefore, in holding that the city court's fine was unconstitutionally imposed, we have effectively affirmed the judgment of the Court of Appeals, as modified herein.

## E. APPLICATION TO *BARRETT v. METROPOLITAN GOVERNMENT*

As in Davis, our first inquiry in this case is whether the fines imposed for violations of the Metropolitan Code of Laws were predominantly intended to serve as punishment. The provision authorizing monetary sanctions for Barrett's five violations of the Code of Laws is section 16.04.172(A), which, at the time of the violations, provided in relevant part as follows:

> Whenever in this title, or in any rule, regulation or order promulgated by any officer or agency of the metropolitan government under authority duly vested in the officer or agency by this title, or if any act is prohibited or is made or declared to be unlawful or an offense or a misdemeanor, or the doing of any act is required, or the failure to do any act is declared to be unlawful or an offense or a misdemeanor, where no specific penalty is provided therefor in this title, the violation of any such provision of this title or such rule, regulation or order, shall be punishable by fine in an amount not to exceed five hundred dollars.

As can be seen in the plain language of this provision, which is not materially different from section 1-8(a) of the Chattanooga City Code, the intended purpose of these sanctions is to punish violations of the Code of Laws. Indeed, more persuasive evidence of a punitive purpose can hardly be derived except through the Council's own expression that the fine is used to punish that which is made unlawful, prohibited, or made or declared to be a misdemeanor.

Nevertheless, in February 1999, the Metropolitan Council passed a resolution to clarify its intention as to the purpose of the penalties imposed by the Code of Laws. In relevant part, this resolution reads as follows:

> Any place in the Metropolitan Code of Laws where the term "it shall be a misdemeanor" or "it shall be an offense" or "it shall be unlawful" or similar terms appear in the Metropolitan Code of Laws to denote that certain conduct is in violation of a Metropolitan Government ordinance, it shall mean "it shall be a civil offense." Anytime the word "fine" appears in a penalty provision of the Metropolitan Code of Laws, it shall mean a "civil penalty."

The preamble clauses of the resolution expressly recognize that the then-present language of the Code of Laws was "inconsistent with the nature of a civil penalty" and "inconsistent with the nature of the assessment." The Metropolitan Government now contends that this Court should give effect to this new language because it represents the true intention of the Metropolitan Council as to the purpose of the sanctions involved.

In previous cases, we have given some interpretive weight to subsequent amendments that purport "to clarify" the original intentions of the legislative body. See, e.g., Wakefield v. Crawley, 6 S.W.3d 442, 447 (Tenn. 1999); Ashe v. Leech, 653 S.W.2d 398, 402 (Tenn. 1983). The general

rule applied to analysis of clarification amendments has been well-articulated by the Court of Appeals:

> A mere change in phraseology does not indicate a change in construction of the statute; but a material change in the phraseology of a statute is generally regarded as a legislative construction that the law so amended did not originally embrace the amended provisions, and this is particularly true if it follows soon after controversies have arisen as to the interpretation of the original act, and intervention of judicial decisions may be a material element in determining the effect of an amendment.

State Bd. of Examiners for Architects & Engineers v. Weinstein, 638 S.W.2d 406, 409 (Tenn. Ct. App. 1982). Using this rule as our guide, this case presents an admittedly close question as to whether the ordinance changes are so material as to negate the Council's intention to clarify existing law. Nevertheless, because Article VI, section 14 initially gives some deference to the stated intention regarding the purpose of the penalty, we will, for purposes of this case only, resolve our doubt in favor of finding that the Metropolitan Council intended for the Code's monetary penalties to serve remedial purposes.

*Analysis of the Actual Purposes or Effects of the Monetary Sanctions*

Presuming that the sanctions imposed by the Code of Laws are remedial in their intended purpose, our next inquiry is whether these penalties are also remedial in their actual purpose and effect. Initially, we acknowledge that the statutory *provisions* of Title 16, separate and apart from any individual sanctions, are intended to be remedial in their purpose and effect. Section 16.04.01 unequivocally states that its purposes are "to secure . . . public safety, health and general welfare, through structural strength, stability, sanitation, adequate light and ventilation and safety to life and property from fire and other hazards incident to the construction, alteration, repair, removal, demolition, [and the] use and occupancy of buildings, structures or premises."

However, the mere fact that the intended purpose of the statute itself is remedial is not also determinative of whether the actual purpose and effect of the statute's penalties are likewise remedial in nature. Whatever effect the February 1999 resolution had upon the *intended* purpose of these monetary sanctions, the resolution did not affect the *actual* purpose or effect of these sanctions, because it was addressed only to the labels of the sanctions within the statutory scheme as a whole. Because Article VI, section 14 is not concerned with the appellation given a penalty, this resolution is of no consequence to the actual purpose and effect of the fines imposed in this case. Therefore, to determine the actual purpose and effect of the fines in this case, we must first examine how monetary penalties can serve remedial goals in general and then determine whether the penalties imposed here truly served a remedial role within the context of their statutory scheme.

Various courts have attempted to describe the attributes typically associated with civil, remedial measures. Some courts have recognized that remedial measures are typically "corrective and equitable in kind." See Dyna-Med, Inc. v. Fair Employment & Hous. Comm'n, 743 P.2d 1323,

-21-

1327 (Cal. 1987) (citation omitted). They are designed primarily "'to rectify,' [or] to 'put right,'" Langford v. Couch, 50 F. Supp. 2d 544, 547 (E.D. Va. 1999) (citation omitted), and they may consist of "[any]thing that corrects, counteracts, or removes an evil or wrong." State v. Zerkel, 900 P.2d 744, 748 (Alaska Ct. App. 1995) (citation omitted); Cabinet Realty, Inc. v. Planning & Zoning Comm'n, 552 A.2d 1218, 1221 (Conn. Ct. App. 1989). Quite simply, therefore, remedial measures are any "means by which a right is enforced or the violation of a right is prevented, redressed, or compensated.'" Overman v. Southwestern Bell Tel. Co., 675 S.W.2d 419, 423 (Mo. Ct. App. 1984) (citation omitted).

Using these definitions as our guide, it is immediately apparent that many sanctions in Title 16 are corrective in nature and therefore serve remedial purposes. Some of these remedial sanctions include the issuance of a stop-work order, Code of Laws § 16.04.110, the revocation of any permit or approval, id. § 16.04.120, and the ability of the director of codes administration to require proof of compliance with the Code at the expense of the owner or agent, id. § 16.04.140. In each of these cases, the sanction seeks to correct or to halt the then-existing violation of the Code.

However, a monetary penalty often stands in sharp contrast to other remedial measures, because a monetary penalty can serve but a few truly remedial purposes. Some examples of truly remedial purposes served by monetary penalties include those that (1) compensate for loss; (2) reimburse for expenses; (3) disgorge "ill-gotten" gains; (4) provide restitution for harm; and (5) ensure compliance with an order or directive, either through the execution of a bond, or as discussed below, through a prospectively coercive fine. Importantly, however, to the extent that a monetary penalty is not designed to serve these or similar goals, it will appear more likely to predominantly serve the purpose of general and specific deterrence. Although we agree that some level of deterrence is present in all remedial measures, when the *predominant* purposes served by the penalty

are to provide general and specific deterrence and to ensure overall future compliance with the law, then the monetary penalty should be deemed as serving punitive purposes for analysis under Article VI, section 14.[22]

*Specific Assessments in this Case*

Leaving aside for a moment the penalty imposed for Barrett's violation of the stop-work order, we turn our attention to the penalties imposed for Barrett's failures to secure a building permit and for his improper installation of roof underlayment. Analyzing the actual purpose and effect of these monetary sanctions within the context of their statutory scheme, we first note that Title 16 of the Metropolitan Code of Laws does not appear to impose monetary penalties for the purpose of rectifying or otherwise correcting violations of its provisions. Rather, Title 16 imposes monetary penalties for past, completed violations of the Code of Laws without regard to correcting or rectifying any harm.

For example, the Code of Laws does not impose monetary penalties for the purpose of compensating the Metropolitan Government or any private party for any loss that has resulted from a failure to comply with its provisions. It does not impose monetary penalties to reimburse the Metropolitan Government, or any private party, for expenses incurred in inspecting sites, in ensuring compliance with its provisions, or in administering any court proceedings.[23] The Code does not impose monetary penalties to disgorge defendants of any undeserved profits, nor does it impose monetary penalties to reimburse the Metropolitan Government, or any private party, for fixing the damage caused by a defendant's noncompliance. Finally, the Code does not impose monetary penalties to secure execution of any type of bond to ensure compliance with a legal obligation or duty.

Moreover, the fines imposed in this case did not have the actual effect of correcting or remedying any of Barrett's violations. We see no indication, for example, that the fines actually corrected the improper installation of roof underlayment. Although Barrett's fines could have been used to pay for the installation of proper roof underlayment—and thereby give some remedial effect

---

[22] Our unwillingness to permit a "remedial" sanction that predominantly serves the purpose of deterrence lies in the ability of this analysis to classify all penalties as remedial, and therefore to serve as an ineffectual measure of the nature of the penalty itself. If one dismisses as remedial those penalties that serve no real remedial purpose, other than to ensure the benefits of compliance with the law, no penalty could ever be properly classified as punitive.

For example, using this type of analysis, the punitive fines imposed for misdemeanors and felonies in Title 40 of the Tennessee Code could all be characterized as "remedial." One would simply need to declare that the fines imposed would help ensure future compliance with the law, which in turn would bring forth the myriad of benefits that gave rise to the enactment of the law in the first place. The sheer elasticity of this analysis leads us to conclude that if the predominant "remedial" purpose served by a monetary sanction is ensuring deterrence against future wrongdoing, then the sanction more properly appears to be punitive in its actual purpose or effect.

[23] That the fine did not serve to recover administrative expenses is clearly seen from the fact that the general sessions court imposed court costs in addition to the five-hundred dollar fine on each warrant.

-23-

to that monetary sanction—it appears that these fines went into the Metropolitan Government's general fund and were not used for this purpose. Moreover, we also see no indication that the penalties have mended any harm associated with Barrett's three failures to secure a building permit. Indeed, whatever harm was caused by his failures in this regard, the fines cannot now be said to have arrested, alleviated, or rectified that harm, which is presumably still present to this day. Consequently, we must conclude that, unlike other sanctions available in Title 16, the fines imposed in this case do not have the actual effect of correcting or remedying any problem associated with Barrett's violations of the Code.

As we stated earlier, we recognize that all fines, whether punitive or remedial in their actual purpose or effect, provide some measure of general and specific deterrence against noncompliance with the law. We also recognize that deterrence is one of several features that secures the benefits of remedial regulations such as these. However, Article VI, section 14 does not consider, as a proper remedial purpose outside of its application, the deterrence provided by the fine or the benefits that such deterrence brings. To the extent that the deterrence associated with a fine appears to be its only or its predominant "remedial" aim, the fine is more properly characterized as being punitive in its actual purpose or effect. Therefore, we conclude that Barrett has shown by clear proof that the actual purpose and effect of these four fines were so punitive as to negate any remedial intent by the Metropolitan Council. Accordingly, we hold that Article VI, section 14 applies with regard to these fines.

*Assessment for the Violation of a Stop-Work Order*

Returning to the assessment for the violation of the stop-work order, we must initially acknowledge that this assessment is conceptually different from the other four fines. More so than the others, a fine for failing to comply with a stop-work order could be remedial if it were imposed as a prospectively coercive measure, *i.e.*, to compel a defendant, then in violation of the Code, to conform to the terms of the order. Indeed, when viewed in this context, it appears that this type of fine is not so much concerned with the underlying violation of the law itself, as it is with ensuring that the underlying violation is corrected, rectified, or alleviated through other remedial measures.

In this manner, this type of fine is closely analogous to civil contempt fines, which are generally regarded as being remedial in nature when (1) the fine is prospectively coercive, or (2) the fine serves to compensate the party injured by the violation of the order. See, e.g., United Mine Workers v. Bagwell, 512 U.S. 821, 829 (1994). Importantly, though, because of its close kinship to the traditional goals of punishment, a prospectively coercive fine possesses a limited ability to serve as a predominantly remedial measure. To this end, the United States Supreme Court has recognized in the civil contempt context that "[w]here a fine is not compensatory, it is civil *only* if the contemnor is afforded an opportunity to purge." Id. (citing Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947)) (emphasis added); see also Parisi v. Broward County, 769 So. 2d 359, 365 (Fla. 2000). In fact, "[t]he absence of a purge provision means that the fine will be imposed regardless of reform and commitment to obey. A fine without a purge provision therefore suggests an intention

to punish past misconduct rather than to insure future lawfulness." New York State Nat'l Org. for Women v. Terry,159 F.3d 86, 94 (2d Cir. 1998).

The purging of a prospectively coercive fine may occur in two ways: (1) the fine is imposed and suspended pending future compliance, see Parisi, 769 So.2d at 365 (citing Bagwell, 512 U.S. at 829); see also Jessen v. Jessen, 567 N.W.2d 612, 618-19 (Neb. Ct. App. 1997); or (2) the fine is imposed *per diem*, or for each day of noncompliance with an order or directive, see United States v. Ayres, 166 F.3d 991, 995 (9th Cir. 1999). This second type of purgeable fine has been recognized as remedial because it "exert[s] a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." Bagwell, 512 U.S. at 829. Thus, in a manner similar to imprisonment for civil contempt, it has been said that the defendant carries the ability to purge the contempt and to avoid further accumulation of fines. Id. By way of contrast, however, a fine that is fixed, determinant, and presents the defendant "no subsequent opportunity to reduce or avoid the fine through compliance," must be deemed to be predominantly punitive in nature. Id.

Using this analogy to civil contempt fines, we conclude that the actual purpose and effect of the fine in this instance were to impose punishment for the violation of the stop-work order. Initially, it is clear that the fine imposed for the violation of the stop-work order did not go to compensate the Metropolitan Government for any damage suffered by the violation. Indeed, no proof was introduced at the hearing to calibrate the amount of the fine to the harm caused by Barrett's failure to obey the stop-work order, thereby denying any claim that compensation was its true purpose.

Therefore, because this fine did not serve to compensate the Metropolitan Government for the harm caused by Barrett's violation of the stop-work order, the fine may be considered remedial only if it could have been purged. However, the fine imposed in this case was fixed and determinate, and Barrett was presented with no opportunity to purge the fine or to escape its consequences by altering his future behavior. Moreover, although the Code of Laws permits *per diem* fines for the violation of a stop-work order, Code of Laws § 16.04.72(A), we see no indication that this particular five-hundred dollar fine was the result of a *per diem* fine imposed to arrest a continuing violation. Rather, the actual purpose of the maximum fine sought in this case is readily apparent from the Metropolitan Government's closing argument before the general sessions court:

Time and time again[, Barrett] has expressed complete disregard for the Building Code, and I think that he won't deny that. But it's gone beyond that into some behavior, intimidating some of these Code employees and doing whatever he can to try and get by without having to pull a roofing permit. And to me it just pushes the limits of decency and of good citizenship in this country.

Thus, because the fine was not compensatory, and because Barrett was not given a subsequent opportunity to reduce or avoid the fine, we must hold that even this fine was predominantly punitive in its actual purpose and effect and subject to Article VI, section 14.

*Summary*

To summarize our conclusions in Barrett's case, we hold that the assessment for the violation of the stop-work order was imposed with the actual purpose and effect of serving as punishment. Although such prospectively coercive fines may be remedial in nature if the defendant is given an opportunity to purge the fine, the court gave Barrett no such opportunity, thereby demonstrating that the purpose of the fine was to punish a violation and not to remedy its effects. We further conclude that because the assessments for the remaining four violations were likewise primarily punitive in their actual purpose and effect, these pecuniary sanctions are also subject to limitation under Article VI, section 14. Therefore, because the Davidson County General Sessions Court, like the Chattanooga City Court, has not been given the authority to empanel a jury for any reason, its ability to assess punitive fines is necessarily limited by Article VI, section 14 to fines not exceeding fifty dollars. We therefore reduce each of Barrett's five fines to fifty dollars for each warrant. See Huffman, 200 Tenn. at 501, 292 S.W.2d at 744; Christian, 184 Tenn. at 165, 197 S.W.2d at 797-98.

The judgment of the Court of Appeals is reversed.

## II. REMAINING ISSUES RAISED IN *CITY OF CHATTANOOGA v. DAVIS*

Although our resolution of the issues pertaining to Article VI, section 14 has resolved the issues raised in Barrett's case, Davis has raised three additional issues for our consideration: (1) whether Tennessee Code Annotated section 6-54-306 violates Article VI, section 14; (2) whether Tennessee Code Annotated sections 6-54-306 and 55-10-307 violate Article XI, section 8 of the Tennessee Constitution, either on their face or as applied to this case; and (3) whether Tennessee Code Annotated section 55-10-307 impermissibly infringes upon the authority of the Hamilton County District Attorney as set forth in Article VI, section 5 of the Tennessee Constitution and Tennessee Code Annotated section 8-7-103. We address each of these issues in turn.

### A. CONSTITUTIONALITY OF TENNESSEE CODE ANNOTATED SECTION 6-54-306 UNDER ARTICLE VI, SECTION 14

Davis first alleges that Tennessee Code Annotated section 6-54-306 is unconstitutional as enacted because it authorizes home-rule municipalities to assess penalties, without prior assessment by a jury, in excess of the fifty-dollar limitation of Article VI, section 14. He also argues that even if the statute is constitutional, its application in this case violated Article VI, section 14. We disagree that the statute is either unconstitutional on its face or, given our holding that Article VI, section 14 applies to proceedings involving a municipal ordinance violation, unconstitutional in its application.

Tennessee Code Annotated section 6-54-306 "empowers" home-rule municipalities "to set maximum penalties of thirty (30) days imprisonment and/or monetary penalties and forfeitures up to five hundred dollars ($500), or both, to cover administrative expenses incident to correction of municipal violations." Taking the facial challenge to the statute first, it is clear that section 6-54-306 does not amount to a *per se* violation of Article VI, section 14. Although counsel for the City of Chattanooga argued in the criminal court proceeding that this statute confers a power to punish, that interpretation is clearly contrary to the express language of the statute, which limits the imposition of monetary penalties solely "to cover administrative expenses." Because the purpose set forth in the statute is a truly remedial purpose—it permits reimbursement for a limited class of expenses—an assessment imposed pursuant to this statute is not subject to limitation by Article VI, section 14.[24] Therefore, whatever authority the City of Chattanooga possesses pursuant to this statute, it is clear that it does not have the power to enact or impose punitive monetary penalties for an ordinance violation in excess of fifty dollars, either with a jury's prior assessment or without. Accordingly, we hold that the appellant's facial challenge to this statute is without merit.

With regard to the statute's application, we also conclude that this issue is without merit, especially given our reduction of the fine imposed in this case. The City of Chattanooga, however, has vigorously argued that the original three-hundred dollar fine should be upheld as a valid assessment of administrative expenses. Claiming that the "administrative expenses [in enforcing the provisions of the City Code] equal or exceed the amounts of any judgments over fifty dollars," the City has attempted to justify the assessment against Davis by showing that the aggregate costs of the city court since 1993 have exceeded the revenues generated by that court. Consequently, the City maintains that the intent behind section 6-54-306 is furthered by the original three-hundred dollar fine because that fine serves "to reduce the economic detriment" to the City of Chattanooga in enforcing its municipal code.

We find no indication that the General Assembly intended for section 6-54-306 to permit an assessment of administrative costs in the individual case based upon the aggregate cost of enforcing all municipal ordinances. Nevertheless, even if the statute could be so construed, Article VI, section 14 would itself limit any such assessment to that which is reasonable under the circumstances of the *individual* case. It cannot be doubted that, unlike all other jurisdictions, the imposing of monetary sanctions upon an individual is of particular constitutional concern to the administration of justice in this state. Consequently, courts have a special obligation to scrutinize such assessments to ensure that they are tailored to their purported remedial purpose. The right guaranteed by Article VI, section 14 was specifically drafted as one belonging solely to the individual—"No fine shall be laid

---

[24] We agree with the appellant that the provision of this statute authorizing imprisonment is troubling, because, by itself, imprisonment can serve no remedial purpose insofar as the stated goal of the statute is concerned, *i.e.*, recovery of administrative expenses. Nevertheless, because Davis was not subject to imprisonment, we need not reach the question of whether imprisonment could be remedial. It is sufficient to state that the monetary sanctions authorized by section 6-54-306 are limited to the remedial purpose of recovering reasonable administrative expenses and are not authorized for punitive measures.

on *any citizen*"—and any assessment that imposes costs for something for which the defendant is not personally responsible will be subject to constitutional limitations.

Therefore, if the City of Chattanooga desires to recover its reasonable administrative expenses incurred in enforcing its municipal ordinances, it will be required to provide a detailed statement of these expenses to the defendant as they were incurred in the *individual* case. A detailed and individualized statement of administrative costs will serve to assure the individual that he or she is not being assessed for the costs of enforcing offenses for which others are responsible, and it will enhance appellate review of these expenses to ensure that municipal courts do not assess punitive sanctions under the guise of recovering "administrative expenses." Consequently, even were we to accept that the original three-hundred dollar fine is justified in order to recover the administrative expenses of the city court, reduction of the fine to fifty dollars would still be required in this case for lack of a detailed and individual accounting of those expenses.

## B. CONSTITUTIONALITY OF TENNESSEE CODE ANNOTATED SECTIONS 6-54-306 AND 55-10-307 UNDER ARTICLE XI, SECTION 8

Davis next challenges Tennessee Code Annotated sections 6-54-306 and 55-10-307 as representing unreasonable and arbitrary class legislation in violation of Article XI, section 8 of the Tennessee Constitution. In relevant part, the Class Legislation Clause reads as follows:

> The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

Davis's argument centers upon his contention that no reasonable basis exists for giving authority to municipalities, but not to unincorporated areas of the state, (1) to establish penalties up to five hundred dollars, see Tenn. Code Ann. § 6-54-306; or (2) to adopt by ordinance state statutes without also requiring the adoption of similar penalties, see Tenn. Code Ann. § 55-10-307.

### *Challenge to Tennessee Code Annotated section 6-54-306*

With regard to Tennessee Code Annotated section 6-54-306, we find that our resolution of this issue is not necessary to fully resolve the merits of Davis's appeal. This Court customarily declines to resolve constitutional issues unless resolution of those issues is necessary to properly resolve the case. See State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996); Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1996). Because we have held that the municipal court proceeding in this case was subject to the limitations of Article VI, section 14, and because the fine imposed has been reduced to fifty dollars, any holding on this issue would not affect the resolution of Davis's appeal. Therefore, we dismiss the appellant's class legislation challenge to Tennessee Code Annotated

section 6-54-306 as moot. See, e.g., State ex rel. Orr v. Thomas, 585 S.W.2d 606, 607 (Tenn. 1979) ("It is, of course, well settled that when the issues sought to be presented by an appeal have been rendered moot pending the appeal[,] the appeal will be dismissed.").

*Challenge to Tennessee Code Annotated section 55-10-307*

The class legislation challenge to Tennessee Code Annotated section 55-10-307, however, cannot be dismissed as moot. Unlike the challenge to section 6-54-306, which went to the heart of the City's ability to impose a punitive fine in excess of fifty dollars, the challenge to section 55-10-307 essentially alleges that the Chattanooga City Council was without authority to enact the reckless driving ordinance under which Davis was convicted. Therefore, because resolution of this issue in favor of the appellant could have the effect of dismissing the charges against him, we take the time to address the issue on its merits.

We have often recognized that the Class Legislation Clause of Article XI, section 8 is similar to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and this Court has previously applied Equal Protection analysis to questions arising under the Class Legislation Clause. See, e.g., Riggs v. Burson, 941 S.W.2d 44, 52 (Tenn. 1997). To this end, we have recognized that Article XI, section 8 "guarantees that persons similarly situated shall be treated alike," Evans v. Steelman, 970 S.W.2d 431, 435 (Tenn. 1998) (citation omitted), and that it "prohibits the General Assembly from suspending the general law or passing any law inconsistent with the general law for the benefit of any individual [or group of individuals] . . . ." Finister v. Humboldt Gen. Hosp., Inc., 970 S.W.2d 435, 440 n.3 (Tenn. 1998).

However, the Class Legislation Clause does not remove from the General Assembly all power to draw classifications distinguishing among differing groups. "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States, and the legislatures are allowed considerable latitude in establishing classifications and thereby determining what groups are different and what groups are the same." State v. Smoky Mountain Secrets, Inc., 937 S.W.2d 905, 912 (Tenn. 1996) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982) (internal quotation marks removed)). Therefore, unless the classification "interferes with the exercise of a 'fundamental right' or operates to the peculiar disadvantage of a 'suspect class,'" Article XI, section 8 requires only that the legislative classification be rationally related to the objective it seeks to achieve. See, e.g., Newton v. Cox, 878 S.W.2d 105, 110 (Tenn. 1994).

In this case, the appellant challenges the propriety of section 55-10-307, which permits municipalities to adopt by reference certain state offenses as city ordinances, on the ground that a classification distinguishing between municipalities and unincorporated areas is unreasonable and arbitrary. He asserts that because the General Assembly did not require that the state penalties be enacted for a violation of the municipal ordinance, a defendant found guilty of driving recklessly within the boundaries of a municipality is subject to different penalties than one found guilty of driving recklessly outside municipal boundaries. Because this allegation does not allege the infringement of a fundamental right or affect a peculiar disadvantage upon a suspect class, we

-29-

determine the statute's validity under the rational basis standard. Under this standard, we presume that the legislature acted constitutionally, and we will uphold the challenged legislation, "if any state of facts can reasonably be conceived to justify the classification or if the unreasonableness of the class is fairly debatable . . . ." See, e.g., Bates v. Alexander, 749 S.W.2d 742, 743 (Tenn. 1988) (citing Harrison v. Schrader, 569 S.W.2d 822, 826 (Tenn. 1978)).

Analyzing this issue carefully, we disagree that section 55-10-307 violates the requirements of Article XI, section 8. Initially, it seems beyond reasonable dispute that the legislature had a rational basis for enacting section 55-10-307. As we have previously recognized ourselves, the legislature may confer jurisdiction upon municipal courts "to try and dispose of cases based upon violation of State [traffic] statutes" for the purposes of "economy, efficiency and expeditious handling of traffic cases." See Hill v. State ex rel. Phillips, 216 Tenn. 503, 508, 392 S.W.2d 950, 952 (1965). Indeed, as evidenced by the section immediately following 55-10-307, it was apparently for this very reason that the legislature permitted municipalities to adopt these traffic statutes by reference into their respective codes.[25]

Given that the General Assembly had a rational basis for enacting section 55-10-307, the question presented is essentially whether Article XI, section 8 requires that penalties established by a city ordinance mirror the penalties found in general state law regulating the same or similar subjects. Although this Court has yet to address this issue directly, we do not believe that a municipality's failure to require the same penalties as mandated by state law violates the Class Legislation Clause, even when the elements required to be proven by state and local law are identical. With respect to the Equal Protection Clause, the United States Supreme Court has held that the Fourteenth Amendment is not violated by different penalties attached to identical crimes, absent evidence of selective enforcement of the law based upon impermissible criteria:

> More importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and *the discretion he exercises when choosing one of two statutes with identical elements.* In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, *but this fact, standing alone, does not give rise to a violation of the Equal Protection* or Due Process Clause. Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution *neither is he entitled to choose the penalty scheme under which he will be sentenced.*

---

[25] Tennessee Code Annotated section 55-10-308 provides that

[w]here [sections] 55-8-101--55-8-180 and 55-10-101--55-10-310 apply to territory within the limits of a municipality, the primary responsibility for enforcing such sections shall be on the municipality which shall be further authorized to enforce such additional ordinances for the regulation of the operation of vehicles as it deems proper.

United States v. Batchelder, 442 U.S. 114, 125 (1979) (emphasis added); see also State v. Thomas, 635 S.W.2d 114, 117 (Tenn. 1982) (approving of the Batchelder rationale).

We agree with the Batchelder rationale, because, for all practical purposes, the situation presented by this case is not materially distinguishable from those situations in which a prosecutor has discretion to charge under different offenses. In the latter situation, an equal protection challenge will not lie (1) "as long as the prosecutor has probable cause to believe that an accused committed an offense," State v. Skidmore, 15 S.W.3d 502, 508 (Tenn. Crim. App. 1999) (citing Wayte v. United States, 470 U.S. 598, 608 (1985)), and (2) the decision was not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," Cooper v. State, 847 S.W.2d 521, 536 (Tenn. Crim. App. 1992) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)). Therefore, unless a defendant can demonstrate that the charge lacks probable cause or is motivated by an invidious intent, a prosecutor will remain generally free to charge that defendant under either of two offenses containing identical elements without running afoul of the Class Legislation Clause. Accordingly, we hold that Tennessee Code Annotated section 55-10-307 does not, on its face, violate Article XI, section 8 of the Tennessee Constitution for the sole reasons that a distinction is made between municipalities and unincorporated areas of the state or that different punishments may be imposed by substantially similar or identical offenses.

In its role as Amicus Curiae, the District Attorneys General Conference argues strongly that section 24-13 of the Chattanooga City Code is not a lawfully enacted municipal ordinance because its provisions do not "mirror" state law as arguably required by section 55-10-307. However, because the issue presented by the appellant regarding the different penalties concerned only the constitutionality of the state statute under Article XI, section 8, we decline to address the argument raised by the Amicus. To be clear, though, our holding that section 55-10-307 does not facially violate Article XI, section 8 in no way resolves the issue of whether Chattanooga City Code section 24-13 must mirror the provisions of Tennessee Code Annotated section 55-10-205 to be statutorily valid. We reserve this issue for decision in future cases.

### C. CONSTITUTIONAL APPLICATION OF TENNESSEE CODE ANNOTATED SECTION 55-10-307 UNDER ARTICLE VI, SECTION 5

Although Tennessee Code Annotated section 55-10-307 does not violate the Class Legislation Clause of Article XI, section 8 as enacted, the appellant challenges the application of this statute in Hamilton County as violative of the District Attorney General's constitutional authority under Article VI, section 5. In relevant part, Article VI, section 5 reads as follows:

An Attorney for the State for any circuit or district, for which a Judge having criminal jurisdiction shall be provided by law, shall be elected by the qualified voters of such circuit or district, and shall hold his office for a term of eight years, and shall have been a resident of the State five years, and of the circuit or district one year. In

all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, the Court shall have power to appoint an Attorney pro tempore.

This constitutional authority of the District Attorney General is supplemented by Tennessee Code Annotated section 8-7-103(1), which provides more specifically that the District Attorney "[s]hall prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto, including prosecuting cases in a municipal court where the municipality provides sufficient personnel to the district attorney general for that purpose."

In Ramsey v. Town of Oliver Springs, 998 S.W.2d 207 (Tenn. 1999), we recently had the opportunity to examine closely the constitutional and statutory authority of the District Attorney General. In that case, the Anderson County District Attorney General challenged a policy and practice of prosecuting state offenses arising in Anderson County in the Oliver Springs City Court, which is located in Roane County.[26] The District Attorney argued that this practice impeded his constitutional and statutory authority to prosecute state offenses. We agreed, and in so holding, we observed that the "District Attorney General's discretion to seek a warrant, presentment, information, or indictment within its district is extremely broad and subject only to certain constitutional restraints." Ramsey, 998 S.W.2d at 909. We also noted that "[a]lthough the General Assembly may enact laws prescribing or affecting the *'procedures for the preparation of indictments or presentments,' it cannot enact laws which impede the inherent discretion and responsibilities of the office of district attorney general without violating Article VI, section 5*." Id. at 910 (citation omitted; emphasis in original).

Relying upon our decision in Ramsey, the appellant in this case argues that the authority of the District Attorney General in Hamilton County has been undermined by City of Chattanooga officers who cite all defendants to the city court, even though the conduct of the defendants is likewise proscribed by state law. We do not take these allegations lightly, because the record contains literally volumes of evidence to support this contention. For example, the record indicates that more than ninety city ordinances have been enacted by the City Council that are identical or substantially identical to state offenses dealing with motor vehicle and traffic offenses. Testimony by two Chattanooga Police Department officers reveals that officers who issue citations under these identical provisions have complete discretion to order an individual, on precisely the same facts, to appear in the city court for violation of a municipal ordinance or to appear in the general sessions court for violation of a state statute. These same officers also confirm that no consultation is sought from the District Attorney General's office before any decision as to the proper charge is made.

In reviewing this evidence, the Court of Appeals concluded that Ramsey could provide no relief because the appellant failed to establish the presence of an actual policy and practice of citing individuals to the city court for violations of state law. However, in a supplement to the appellate record, the appellant has brought to our attention evidence of such a policy and practice in the form

---

[26] The Town of Oliver Springs is located in both Anderson and Roane counties.

of a document entitled "Police Circular # 75."  In this circular dated August 16, 2000, the Chattanooga Chief of Police issued the following order to his officers:

> Effective immediately, if an officer issues a traffic citation for a violation in which there is both a state and city violation, the officer is to cite the person for violation of the city ordinance.  The issuance of citations to General Sessions Court is to be used only for charges in which a city ordinance does not exist.

In many respects, this practice by the City of Chattanooga perhaps represents the most disturbing aspect of this case.  A letter from the District Attorney General to the Chief of Police contained in the record summarizes the problem in clear and unequivocal terms: "Your directive has the potential for allowing state law violators to avoid appropriate punishment, removes my ability to enhance punishment for state law violators[,] and infringes upon my constitutional duty and responsibility to prosecute those who violate the laws of the State of Tennessee."  Indeed, through this "potential" infringement, the City of Chattanooga has received a financial windfall, which, according to the city court judge himself, was a direct result of the City Council passing ordinances that transferred state cases to city court, "thereby allowing the revenues to remain in Chattanooga." Transcript, Minutes of Chattanooga City Council Meeting, at 1-2 (Sept. 5, 1995).[27]

Despite the probable unconstitutionality of the policies and practices of the City of Chattanooga, however, we decline to take corrective action at this time.  From our further review of the record, we must agree with the City that the appellant lacks any legal standing to challenge the usurpation of the District Attorney General's constitutional or statutory authority.  To establish one's standing to bring an action, "a party must demonstrate (1) that it sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is apt to be redressed by a remedy that the court is prepared to give."  See, e.g., Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992).  Whatever interest the appellant has in the resolution of this issue, we find that it is indistinguishable from that possessed by the public at large.  Moreover, not only has Davis failed to show any particularized injury or harm resulting from this policy and practice, but he has, if anything, received some measure of benefit by it by forgoing the possibility of incarceration, Tenn. Code Ann. § 55-10-205, and by forgoing the possibility of enhanced punishment for future violations under the Motor Vehicle Habitual Offenders Act, Tenn. Code Ann. §§ 55-10-601 to -618.  Consequently, we are constrained to hold that Davis lacks legal standing to constitutionally challenge the application of section 55-10-307 in Hamilton County or to claim any judicial relief from it.  See, e.g., Ashwander v. Tennessee

---

[27] Also at this meeting, the city court judge remarked that "if persons are fined for driving without a license[,] we keep the entire amount[,] plus a part of the court costs; that money has been redirected back into the City of Chattanooga."  This redirecting of money was one reason that the city court judge believed that the revenue numbers from the city court "are as impressive as they are."  Transcript, Minutes of Chattanooga City Council Meeting, at 2 (Sept. 5, 1995).  These transcripts were admitted into evidence without objection at the August 13, 1999, hearing in the Hamilton County Criminal Court.

Valley Auth., 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) ("The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.").

We are aware that some commentators have criticized adherence to the particularized injury requirement of the standing doctrine as being inadequate in a time when the courts are believed to have "a special function with regard to the Constitution" as its "final authoritative interpreter." See Henry P. Monaghan, Constitutional Adjudication, The Who and the When, 82 Yale L.J. 1363, 1366 (1973). Indeed, because of this concern, some states have adopted a "public rights" exception to private party standing. The Ohio Supreme Court, for example, has recently abrogated its personal injury requirement for standing when the plaintiff sues to resolve constitutional questions and enforce constitutional compliance on issues of "great public importance." See State ex rel. Ohio Academy of Trial Lawyers v. Sheward, 715 N.E.2d 1062, 1104 (Ohio 1999); see also State ex rel. Sego v. Kirkpatrick, 524 P.2d 975, 979 (N.M. 1974); Jenkins v. State 585 P.2d 442, 443 (Utah 1978).

However, except with regard to the Office of the Attorney General, see State v. Heath, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990), the courts of this state have yet to recognize a general "public rights" exception to the standing requirement, and we decline to do so in this case. While our case law does recognize a "great public interest" exception to the doctrine of mootness, Walker v. Dunn, 498 S.W.2d 102, 105 (Tenn. 1972), no comparable legal theory may be found that grants legal standing where none existed in the first instance, cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180 (2000). Therefore, because the appellant has never possessed legal standing to seek relief from the unlawful infringement on the constitutional and statutory authority of the District Attorney General, we are unwilling to fully address this issue at this time.

Because it is grounded in the organic law of this state, the authority of the District Attorney General to prosecute according to the law must be vindicated in the face of all infringements, no matter their source. Nevertheless, because the appellant lacks sufficient special injury or real interest in the resolution of this issue, and because he may claim some measure of benefit from the practice in Hamilton County, we must decline to grant any judicial relief at this time. As the infringement in this case is that of the constitutional and statutory authority of the District Attorney General in Hamilton County alone, we conclude that the vindication of that authority should more properly proceed at the behest of that office.

**CONCLUSION**

To summarize our various holdings in these cases, we first hold that Article VI, section 14 applies to proceedings involving the violation of a municipal ordinance when either the intended purpose or the actual purpose or effect of the monetary assessment is to serve as punishment. Because Article VI, section 14 looks to the substance of a pecuniary sanction rather than to its technical form, this Court will not make technical distinctions between the nature of the proceeding wherein the sanction is imposed or give weight to the label attached to the sanction itself. Instead, we hold that a monetary sanction will be subject to the limitations of Article VI, section 14 when (1)

-34-

the legislative body creating the sanction primarily intended that the sanction punish the offender for a violation of the ordinance; or (2) despite evidence of remedial intent, the monetary sanction is shown by the "clearest proof" to be so punitive in its actual purpose or effect that it cannot legitimately be viewed as remedial in nature.

Applying this test to the cases before us, we hold that the penalty imposed by the Chattanooga City Court in City of Chattanooga v. Davis was intended to serve as punishment for the violation of an ordinance. The intent to punish is clear on the face of the several municipal ordinances, and nothing in the Chattanooga City Code otherwise indicates that these assessments were truly intended to serve any remedial purpose whatsoever. With regard to Barrett v. Metropolitan Government, we hold that the actual purpose and effect of these sanctions were to impose punishment for violations of the Code of Laws. Although a pecuniary sanction imposed for the failure to comply with a stop-work order may sometimes be characterized as predominantly remedial in its actual purpose and effect, Barrett was given no opportunity to purge the fine by correcting the violation. As such, we hold that the actual purpose and effect of this fine were also punitive in nature. Therefore, the judgment of the Court of Appeals is affirmed as modified in Davis's case, and the judgment of the Court of Appeals is reversed in Barrett's case. Because no court, other than one of general jurisdiction, has been granted the authority to empanel a jury to determine facts or to impose punishment, we reduce each of the unlawful fines imposed in these cases to fifty dollars, the maximum assessment allowed under such circumstances by Article VI, section 14.

With regard to the additional issues raised in City of Chattanooga v. Davis, we hold that Tennessee Code Annotated section 6-54-306 does not violate Article VI, section 14, because it does not authorize punitive monetary sanctions to be imposed without a jury. As the language of the statute indicates, any authority given to the City of Chattanooga by this statute is limited solely to monetary assessments that seek "to cover administrative expenses." Because reimbursement for expenses is truly a remedial purpose served by monetary penalties, an assessment imposed pursuant to this statute is not limited by the Fifty-Dollar Fines Clause. However, Article VI, section 14 does require that the defendant receive a detailed statement of these expenses as they pertain to the *individual* case to ensure that municipal courts are not assessing punitive sanctions under the guise of recovering "administrative expenses." The judgment of the Court of Appeals is affirmed on this issue.

With regard to the allegations that Tennessee Code Annotated sections 6-54-306 and 55-10-307 violate the Class Legislation Clause of Article XI, section 8, we must dismiss the challenge to section 6-54-306 as moot. As to section 55-10-307, we hold that this statute does not violate Article XI, section 8 for the sole reasons that a distinction is made between municipalities and unincorporated areas of the state or that different punishments may be imposed by substantially similar or identical offenses. However, this holding in no way resolves the challenge raised by the Tennessee District Attorneys General Conference that the city ordinance is in violation of the state law, and we reserve any determination on that issue for later cases. The judgment of the Court of Appeals is affirmed on these issues.

Finally, we conclude that Davis has established a compelling case demonstrating that some policies and practices of the City of Chattanooga infringe upon the District Attorney General's constitutional and statutory authority, in direct violation of our decision in Ramsey v. Town of Oliver Springs, 998 S.W.2d 207 (Tenn. 1999). However, because the appellant has failed to demonstrate any actual harm resulting from the unlawful practices alleged, and because any harm that could have been suffered was not different in kind from that suffered by the public at large, we conclude that he possesses no legal standing to raise and litigate this issue. Rather, we hold that the proper party seeking judicial redress of any of the practices alleged herein is the District Attorney General himself. Accordingly, the judgment of the Court of Appeals is affirmed on this issue, as modified.

Costs of the appeal in City of Chattanooga v. Davis shall be assessed to the City of Chattanooga, for which execution shall issue if necessary. Costs of the appeal in Barrett v. Metropolitan Government shall be assessed to the Metropolitan Government of Nashville and Davidson County, for which execution shall likewise issue if necessary.

 

WILLIAM M. BARKER, JUSTICE